Adam Robinson )
16732 Gooseneck Terrace
Olney, MD. 20832,

)
)
)
v. )
)
)
)
)
Department of Homeland Security Office of )
Inspector General )
245 Murray Lane SW )
Washington D.C. 20528,
                    Agency.

)
)
)

Case: 1:20-cv-02021   Jury Demand
Assigned To : Cooper, Christopher R.
Assign. Date : 7/20/2020
Description: Employ. Discrim.  (H Deck)



RECEIVED
Mail Room
JUL 20 2020
Angela D. Caesar, Clerk of Court
U.S. District Court, District of Columbia

# **Complaint**

## Statement of Facts

### A. Overview

I, Adam Robinson, the plaintiff commencing this civil action was an employee at the
United States Department of Homeland Security's Office of Inspector until being
questionably removed in February of 2019. It is my contention that the agency's basis for
removing me is unlawful on two fronts: first it constitutes an unlawful exercise of its
authority pursuant to the statute it relied on to remove me (5 U.S.C. § 43) and second it
represents a violation of Title VII of the 1964 Civil Right Act as the agency's real reason
for taking action against had less to do with performance, and more to do with my
identity; that of a Black (African American) male. In connection with the agency's
discriminatory conduct during FY 2018 I timely filed an EEO complaint, detailing the
discriminatory actions the agency relied on during FY 18 to derail my career progress and
advance my similarly situated white female colleague's career at my expense. In response
to that, the agency made the extraordinary decision to retaliate against me and remove me
from the Federal service. In response, I contested the agency's decision to remove at the
Merit Systems Protection Board (MSPB). I now appeal to this forum to obtain monetary
and injunctive relief connected to the agency's unlawful conduct.

### B. Unfair and Unequal Performance standards



RECEIVED
VOID
Clerk, U.S. District and
Bankruptcy Courts

1

During late 2017 I was assigned to a DHS Inspector General's project review team entitled ICE Removals. The scope and purpose of that project was to identify barriers to removal that officers at the Immigration and Customs Enforcement (ICE) office encountered when attempting to remove aliens who were in detention at ICE. As a program analyst (inspector) my responsibilities primarily focused on interviewing relevant ICE component officials and writing Memorandums of Record (MOR) that ostensibly served as documentary accounts of key interviews at ICE. In her capacity as team lead Ms. Lorraine Eide (Lead Inspector) had control of day to day activities including overall performance evaluations of written work products. Ms. Eide routinely applied an unfair performance standard to my work when evaluating my MORs to that of Ms. Donna Ruth's. More often than not, Ms. Eide not only required more information, but also required a higher degree of specificity when evaluating my written work product to Ms. Ruth's. While examples abound, the best evidence to support this contention can be seen on June 26, 2018. During a routine meeting that occurred on between Ms. Eide and myself Ms. Eide unilaterally and drastically altered the performance standards for completion of MORs. During that meeting, Ms. Eide stated that I would have to have four key takeaways in order to have my MORs finalized whereas Ms. Ruth did not. This is important because the agency's reason for removing me was that I did not submit timely written work products. This change of written performance standards reserved exclusively for me during the Performance Improvement Period not only negatively impacted my ability to submit timely work, but it also constituted discrimination and an unreasonable Performance Improvement Period which violates Title VII of the 1964 Civil Rights Act and 5 U.S.C. § 4303.

C. <u>False Accusations and False Facts used to support removal</u>

Ms. Carie Mellies my supervisor and rating official for FY 2018 supplied false information and false facts to first support her proposal remove, and later to persuade the deciding official into removing me. First, Ms. Mellies, cited that one of her reasons for placing me on the PIP was that I had poor teamwork and cooperation skills. Afterwards, at the closure of the PIP Ms. Mellies stated that one of her reasons for opting to remove me was that she observed me telling Ms. Eide, that if she needed a fourth bullet point for an MOR that she (Ms. Eide) could write it up and send it me. Importantly, Ms. Mellies was not at that meeting, and she (Ms. Mellies) along with Ms. Eide have since admitted under oath that she (Ms. Mellies) was not present at that meeting. Importantly, this constitutes a materially misleading statement that was used as support for the agency's decision to remove. As such, the agency's decision to remove is premised on false facts which consequently harmed me: professionally, financially, and emotionally.

<u>Basis for Jurisdiction</u>

The United States District Court has jurisdiction over the matter because the agency discriminated and retaliated against me, Adam Robinson, under Title VII of the 1964 Civil Rights Act and that discrimination and retaliation raises the issue of Federal Question under 28 U.S.C. §1331. In addition, the agency also failed to provide me with a reasonable opportunity to demonstrate acceptable performance under 5 U.S.C. § 4303, which also raises the issue of federal question under 28 U.S.C. § 1331.

<u>Trial by Jury:</u> I want a Trial by Jury

<u>Monetary Relief Requested:</u> $454,000.00

<u>Injunctive Relief Requested:</u> Reversal of the decision to remove and removal of all false information from my personnel files.

**UNITED STATES OF AMERICA**
**MERIT SYSTEMS PROTECTION BOARD**
**WASHINGTON REGIONAL OFFICE**

ADAM ROBINSON,

      Appellant,

    v.

DEPARTMENT OF HOMELAND
  SECURITY,

      Agency.

DOCKET NUMBER
DC-0432-19-0299-I-2

DATE: April 15, 2020

Adam Robinson, Olney, Maryland, pro se.

Jillian E. Martin, Esquire, Mariama Liverpool, Esquire, and
  Melinda D. Holliday McDonald, Esquire, Washington, D.C.,
  for the agency.

**BEFORE**
Lindsay Young Harrell
Administrative Judge



**INITIAL DECISION**

      On February 19, 2019, the appellant filed an appeal challenging the agency's decision to remove him from the position of Program Analyst for unacceptable performance under 5 U.S.C. Chapter 43. Appeal File (AF)[1], Tab 1. The appellant raised affirmative defenses of sex and race discrimination, retaliation for prior equal employment opportunity (EEO) activity, granting of an unauthorized advantage or preference, whistleblower retaliation, and harmful procedural error. AF, Tab 49 at 2. I held the appellant's requested hearing on July 17-18, 2019. AF, Tab 52 (Hearing Disc, Day 1 (HD1)); AF, Tab 53 (Hearing Disc, Day 2 (HD2)). On October 15, 2019, the appellant's appeal was dismissed

---

[1] References to the "Appeal File" regard MSPB Docket No. DC-0432-19-0299-I-1, the appellant's initial appeal, unless otherwise stated.

2

without prejudice.   AF, Tab 54.   His appeal was automatically refiled on December 17, 2019.   Refiled Appeal File (RAF), MSPB Docket No. DC-0432-19-0299-I-2, Tab 1.

The Board has jurisdiction over this appeal pursuant to 5 U.S.C. § 4303(e), 5 U.S.C. § 7701, and 5 C.F.R. § 432.106.   For the reasons that follow, the agency's removal action is AFFIRMED.

analysis and findings

Background

On June 13, 2016, the appellant began his employment with the agency as a Program Analyst, GS-0343-09.  AF, Tab 10 at 31.   At the time of his removal in February 2019, the appellant was a Program Analyst, GS-0343-11, Step 1 (GS-11), with the Office of Inspections and Evaluations (I&E) in the agency's Office of the Inspector General (OIG).   AF, Tab 10 at 28.   The I&E "conduct[ed] inspections, evaluations, and reviews using different study methods and evaluative techniques to improve policies, programs, and procedures."   AF, Tab 13 at 66.   The appellant "serve[d] as a member of inspection, evaluation, and review teams."   *Id.*   As a GS-11 Program Analyst, he had responsibilities similar to those of a GS-12 Program analyst.   *Id.*   Unlike employees at the GS-12 level, however, GS-11 analysts received "direction and assignments . . . from the team leader or a higher-level program analyst."   *Id.*   Carie Mellies, Supervisory Program Analyst served as the appellant's first line supervisor.  As such, she was responsible for evaluating and managing the appellant's performance.   HD1 (testimony of Mellies).   Although she was generally not assigned to the same projects as the appellant, she received feedback regarding his work from other managers, such as the Lead Inspector, regarding his performance on a particular project.   *See id.*   Tatyana Martell, Chief Inspector, was the appellant's second level supervisor.   HD1 (testimony of Martell).

The agency provided the appellant with an "Employee Performance Plan and Rating Form" for the appraisal period in question, which ran from October 1,

3

2017 through September 30, 2018.   The performance plan contained seven Critical Job Elements (CJE):  Communication, Customer Service, Representing the Agency, Teamwork and Cooperation, Technical Proficiency, Performance Goals and Objectives.   Employees received one of four possible ratings with respect to each CJE: Achieved Excellence (AX), Exceeded Expectations (EE), Achieved Expectations/Fully Successful (AE), or Unacceptable (U).  AF, Tab 13 at 54.

The appellant's performance plan described the ratings of "Achieved Expectations" and "Achieved Excellent" within the context of each CJE. Relevant to this appeal, a rating of "Achieved Expectations" in Communication (CJE1) indicated the employee,

- Applies effective listening skills and appropriately responds when communicating with others
- Solicits, shows respect for, and carefully considers others ideas, comments, and questions with scope of work
- Effectively explains or defends viewpoint when necessary
- Independently prepares and delivers communications that are clear, concise, and timely
- Writes communications that generally require few substantive or editorial revisions.

AF, Tab 13 at 55.   A rating of "Achieved Expectations" in Teamwork and Cooperation" (CJE4) indicated the employee,

- Contributes to achieving goals and provides support to advance goals
- Independently offers assistance and provides support to advance goals
- Deals with everyone fairly, equitably, and professionally, respecting and valuing individual differences and diversity
- Effectively handles disagreements or conflicts, resolving them in a constructive manner
- Consults with senior team members or supervisors when appropriate and makes viable recommendations for resolving differences.

4

AF, Tab 13 at 56.  A rating of "Achieved Expectations in Technical Proficiency (CJE5) indicated the employee,

- Successfully applies knowledge and skills (including use of technology and tools) to independently perform a full range of assignments; seeks guidance as appropriate
- Uses formal or informal feedback on own performance to develop job skills that facilitate achieving results
- Demonstrates an understanding of the applicable organization mission, functions, and values, the interrelationships between various units and organizations, and relevant policies/procedures (to include, as appropriate, responsibilities toward the protection of classified national security information); uses this knowledge to carry out a full range of work assignments
- Demonstrates working knowledge of the resources available to perform work; identifies and acquires needed resources, and ensures that use of resources is efficient and consistent with the planned project or activity
- Effectively gathers complete and relevant information from appropriate sources to address issues or problems
- Effectively analyzes information to identify issues, weigh alternatives, and draw logical conclusions; anticipates and resolves a full range of problems or issues
- Makes well-reasoned, timely decisions and recommendations affecting own work.

AF, Tab 13 at 57.

In December 2017, the appellant was assigned to a project entitled "ICE Removals of Detained Aliens" ("ICE Removals" or "ICE Removals project"). HD1 (testimony of Eide).  This project focused on identifying factors that made it difficult to remove aliens after a final order for their removal was given.  HD1. The team assigned to this project included the appellant; Donna Ruth, Senior Inspector; Lorraine Eide, Team Lead Inspector; and Tatyana Martell, Chief Inspector.  AF, Tab 47 at 304.  The investigation for the ICE Removals project required interviewing experts.  HD1 (testimony of Eide).  Team members then memorialized the interviews in a Memorandum of Record (MOR).  For each

5

MOR, one team member was designated as the "drafter," and another was designated as the "reviewer." The appellant was assigned to draft and review MORs throughout the ICE Removals project. *See* HD1 (testimony of Eide and Mellies). As the title suggests, the drafter was responsible for drafting a "clear, concise, and timely" memorandum setting forth the relevant statements of the interviewee in the order in which they were said. AF, Tab 13 at 55; Tab 47 at 240. The "reviewer" then reviewed the draft MOR for style, accuracy, and completeness, and – importantly – added a conclusion. AF, Tab 47 at 215; *see also* HD1 (testimony of Eide). The conclusion was to be an executive summary of the interview, highlighting the important points and identifying issues. AF, Tab 47 at 215; *see generally* HD1 (testimony of Eide and Mellies); HD2 (testimony of Martell). Pursuant to the ICE Removals project Standard Operating Procedure (SOP), reviewers were permitted to use bullet points in a conclusion so long as there was an introductory and concluding sentence. AF, Tab 47 at 215 ("Bullet points are fine as long as there is an introductory and concluding sentence.").

The ICE Removals project formally began on March 8, 2018, when the entrance conference was held. *See* AF, Tab 47 at 304; HD1 (testimony of Eide). At such a conference, program officials discuss the objectives, scope and timeline for a project, and receive preliminary information. AF, Tab 47 at 236. It also serves as an opportunity for team members to clarify any initial issues and determine how responses to data requests will be received. *Id.* Fieldwork began on the project subsequent to the entrance conference and was to be completed by June 2018. *Id.* at 304. The ICE Removals project's draft report was due to be issued in August 2018. *Id.* at 304.

In March 2018, Ms. Eide came to Ms. Mellies with concerns about the appellant's performance. HD1 (testimony of Mellies). Specifically, Ms. Eide referenced issues related to the timeliness and accuracy of the appellant's work. *Id.* In response, Ms. Mellies mentioned different approaches Ms. Eide could take to address her concerns, such as ensuring her emails to the appellant were clear

6

and holding more one-on-one meetings with him. *Id.* As Ms. Mellies held monthly meetings with the appellant, she discussed Ms. Eide's concerns with him as well. *Id.* Ms. Mellies recalled that the appellant was responsive to her remarks regarding the timeliness of his work products and the importance of finalizing his assignments; she stated he agreed that he should "accept the feedback and move on." *Id.*

On April 25, 2018, Ms. Mellies conducted the appellant's mid-year performance progress review. AF, Tab 13 at 63. Both the appellant and Ms. Eide were present for this meeting. *See id.* Ms. Mellies told the appellant he had not completed 12 MORs that had been pending since the ICE Removals entrance conference, implicating his performance in CJEs 1 and 5. *See id.* Additionally, she noted the appellant was refusing to process Ms. Ruth's comments on his MORs and to complete his reviews of Ms. Ruth's MORs; as such, Ms. Eide was forced to serve as either the drafter or reviewer on every MOR, which in turn required her to attend every interview. *See id.* The appellant stated to Ms. Mellies that he did not agree with her feedback, but did not expound upon his statement. HD1 (testimony of Mellies). Nevertheless, Ms. Mellies informed the appellant that his current work level, if not improved, would support a performance improvement plan. *Id. See also* AF, Tab 13 at 64 ("If improvements are not made, and the performance issues persist, then there may be support for a Performance Improvement Plan.").

On June 19, 2018, Ms. Mellies issued to the appellant an "Opportunity to Demonstrate Acceptable Performance" (ODAP). AF, Tab 13 at 25. The ODAP was "based on [the appellant's] unacceptable performance during the current performance cycle." *Id.* It explained that the appellant's performance was "Unacceptable" in CJE1, Communication; CJE4, Teamwork and Cooperation; and CJE5, Technical Proficiency. *Id.* The ODAP further stated the appellant would have 30 days to demonstrate acceptable performance. *Id.*

7

In order to improve his performance, the appellant was tasked with addressing 13 outstanding MORs under CJE 1, four analytical projects under CJE 5, and participating in team meetings and resolving any disagreements constructively if they should arise under CJE 4. *See* HD1 (testimony of Mellies). Under the ODAP, the appellant was to complete specific assignments by the end of each week – three MORs and one analytical project. AF, Tab 13 at 30-34. Ms. Mellies noted she provided him with an assignment log upon issuance of the ODAP so that he could track his progress. HD1 (testimony of Mellies). With respect to the MORs, there were six with respect to which the appellant was the reviewer, and seven more where he was the drafter. *Id.* According to Ms. Mellies, the appellant only needed to address the tracked changes of his reviewer on several of the MORs where he was the drafter. *Id.* Thus, she determined the completion of 13 MORs in 30 days was achievable. *Id.* Regarding the team meetings, Ms. Mellies testified she was "trying to come up with something that was measurable" and that which would allow "room for disagreements." HD1 (testimony of Mellies). With respect to the analytical projects, she explained that the evaluation metrics came directly from the appellant's performance plan and she developed relevant projects with respect to which she thought the appellant could be successful. *Id.* These projects did not require "data analytics" skills. Rather, they required the appellant to determine how best to filter down a sample size and filter Microsoft Excel files through what Ms. Eide described as "counting exercises." *See* HD1 (testimony of Eide and Mellies). Prior to the ODAP, the appellant requested data analytics training; however, Ms. Martell rejected his requests. HD1 (testimony of Martell). She testified she found his requests to take such training "premature" because few projects require that skillset and also recalled that the courses were "very expensive." *See id.*

Upon Ms. Mellies' issuance of the ODAP memorandum to the appellant, he told her that he disagreed with her decision to issue the ODAP. HD1 (testimony

8

of Mellies). The appellant claimed that because Ms. Mellies was not working with him directly on the ICE Removals project, she could not conclude that his performance was deficient with respect to his work on it. *Id.* According to Ms. Mellies, she was receiving regular feedback regarding the appellant's performance from Ms. Eide, and was also reading all of his MORs and other assignments. *Id.* She also met weekly with the appellant during the ODAP, aside from one week when she was on vacation and, thus, Ms. Eide filled in. *Id.*

On June 27, 2018, Ms. Eide met with the appellant regarding the "Soto" MOR. Ms. Eide provided guidance to the appellant with respect to the conclusion for which he was responsible, encouraging him to use four bullet points rather than narrative as a technique for completing the conclusion more quickly. *See* HD1 (testimony of Eide). According to Ms. Eide, there was no requirement that every conclusion contain four bullet points; rather, utilizing bullet points was a suggestion she offered for the Soto MOR in order to assist the appellant in completing the conclusion without necessitating further revision or discussion. *See id.* Ms. Eide testified that she and the appellant developed three bullet points together, and she then suggested he create a fourth. *See id.* In response to her the appellant stated that she should type up a fourth bullet point and send it to him. *See id. See also* AF, Tab 47 at 203. Ms. Eide informed Ms. Mellies of the conversation, and Ms. Mellies spoke directly with the appellant about it. HD1 (testimony of Mellies).

On July 25, 2018, Ms. Mellies issued a "Closure of Opportunity to Demonstrate Acceptable Performance," which concluded that the appellant "failed to demonstrate acceptable performance and failed to improve his performance to a level of Achieved Expectations" in the same three elements. AF, Tab 13 at 14 (internal quotation marks omitted).

On August 8, 2018, Ms. Mellies proposed the appellant's removal. AF, Tab 10 at 127. On November 21, 2018, the appellant's representative submitted a written reply to the Notice of Proposed Removal to Ms. Martell, who served as

9

the agency's deciding official. AF, Tab 10 at 44-124. On December 4, 2018, the appellant and his representative provided an oral reply. *Id.* at 42. On February 1, 2019, Ms. Martell issued a decision removing the appellant "based on [his] failure to perform above the unacceptable level" in the same three elements. AF, Tab 51. The decision notified the appellant of his Board appeal rights, and this appeal ensued. AF, Tab 10 at 40.

Legal Standards under Chapter 43

In order to sustain a performance-based action under 5 U.S.C. Chapter 43, the agency must prove by substantial evidence that: (1) it communicated to the appellant the performance standards and critical elements of his position; (2) the appellant's performance standards are valid under 5 U.S.C. § 4302(b)(1); (3) the agency warned the appellant of the inadequacies of his performance during the appraisal period and gave him an adequate opportunity to improve; and (4) after an adequate improvement period, the appellant's performance remained unacceptable in at least one critical element. *See Towne v. Department of the Air Force*, 120 M.S.P.R. 239, ¶ 6 (2013). Substantial evidence is defined as the "degree of relevant evidence that a reasonable person, considering the record as a whole, might accept as adequate to support a conclusion, even though other reasonable persons might disagree." *Id.*; 5 C.F.R. § 1201.4(p). Substantial evidence is a lower standard of proof than a preponderance of the evidence. 5 C.F.R. § 1201.4(p). The agency also bears the burden of proving that the Office of Personnel Management (OPM) approved its performance appraisal system and any significant changes thereto, if the appellant raises such a challenge. *See Towne*, 120 M.S.P.R. 239, ¶ 6 n. 5. Here, although the appellant initially challenged OPM's approval of the agency's appraisal system, he later withdrew his challenge. *See* AF, Tab 50. Therefore, OPM's approval of the agency's performance system is not at issue here. *See Daigle v. Department of Veterans Affairs*, 84 M.S.P.R. 625, ¶¶ 10-12 (1999) (holding that agencies are no longer

10

required to submit evidence proving that OPM approved its performance appraisal system unless the issue is raised by the appellant).

Where, as here, the appellant raises affirmative defenses challenging the agency's action, the appellant bears the burden of proving such claims by a preponderance of the evidence. *See* 5 C.F.R. § 1201.56(b)(2)(i)(C). A preponderance of the evidence is the "degree of relevant evidence that a reasonable person, considering the record as a whole, would accept as sufficient to find that a contested fact is more likely to be true than untrue." 5 C.F.R. § 1201.4(q).

Finally, the Board lacks authority to consider the appropriateness of the penalty when deciding an appeal under Chapter 43 of Title 5. *See Lisiecki v. Merit Systems Protection Board*, 762 F.2d 1558, 1566-67 (Fed. Cir. 1985), *cert. denied*, 475 U.S. 1108 (1986).

<u>The agency proved the appellant's unacceptable performance by substantial evidence.</u>

    1. *<u>The agency communicated the critical elements and performance standards to the appellant and his performance standards were valid.</u>*

Section 4302(b)(2) of Title 5 provides in relevant part that "at the beginning of each [] appraisal period, [an agency shall] communicat[e] to each employee the performance standards and critical elements of the employee's position." The Board has explained that this statutory provision "constitutes a substantive right which requires an agency to ensure that employees are aware in advance of the performance standards and critical elements of their positions." *Cross v. Department of the Air Force*, 25 M.S.P.R. 353, 357 (1984).

Performance standards must, to the maximum extent feasible, permit the accurate appraisal of performance based on objective criteria. 5 U.S.C. § 4302(c) (1). Performance standards must be reasonable, realistic, attainable, and clearly stated in writing. *See Thomas v. Department of Defense,* 95 M.S.P.R. 123, ¶ 12

11

(2003), *aff'd*, 117 Fed. Appx. 722 (Fed. Cir. 2004); *Towne*, 120 M.S.P.R. 239, ¶ 21. Additionally, performance standards should also be specific enough to provide an employee with a firm benchmark toward which to aim her performance, and they must be sufficiently precise so as to invoke general consensus as to their meaning and content. *Id.* Performance standards are not valid if they do not set forth the minimum level of performance that an employee must achieve to avoid removal under chapter 43. *Id.*; *see also Henderson v. National Aeronautics & Space Administration*, 116 M.S.P.R. 96, ¶ 9 (2011). Nevertheless, an agency, may cure a facially vague performance standard by fleshing out the standard through oral and written communication in a PIP notice and during the PIP. *See Towne*, 120 M.S.P.R. 239, ¶ 23.

The Board will defer to managerial discretion in determining what employees must do in order to perform acceptably in their positions. *See Lee v. Environmental Protection Agency*, 115 M.S.P.R. 533, ¶ 29 (2010). Thus, an agency is free to set its performance standards as high as it thinks appropriate, provided those standards are objective and meet the other requirements of 5 U.S.C. § 4302(c)(1). *See Jackson v. Department of Veterans Affairs*, 97 M.S.P.R. 13, ¶ 14 (2004). Managers of federal agencies, moreover, have the authority to decide what agency employees must do in order to perform acceptably in their particular positions. *Id.* Accordingly, the focus of the Board's inquiry in a Chapter 43 appeal is whether the standards set by the agency "measure the performance of the job in question on the basis of the objective criteria set forth by the agency[.]" *Id.* Provided this standard it met, the Board will defer to the agency's structuring of an employee's performance standards. *Id.*

Here, it is undisputed that Ms. Mellies issued the appellant his FY 2018 performance plan on January 10, 2018. AF, Tab 13 at 53. She testified that he did not express any objections to the plan or the standards therein, and this testimony was unrebutted. *See* HD1 (testimony of Mellies). Moreover, the

12

appellant's performance plan contained a description of 5 CJEs, as well as an explanation of the "Achieved Expectations" and "Achieved Excellence" performance levels.  AF, Tab 13 at 55-57.  Upon review, I find that these performance standards were "sufficiently precise and specific" to permit an accurate evaluation of the appellant's performance on the basis of objective criteria related to the job.  *See Salmon v. Social Security Administration*, 663 F.3d 1378, 1381-82 (Fed. Cir. 2011).  Likewise, the appellant has not alleged that his performance standards were confusing, vague, or otherwise improper.  *See, e.g.*, AF, Tab 1.  Consequently, I find that the relevant standards are valid as required by 5 U.S.C. § 4302(b)(1) because they permit the accurate evaluation of his job performance on the basis of objective criteria.

I find the critical elements in question provide an objective, realistic, and accurate assessment of the appellant's performance. These standards, moreover, provide a specific numeric evaluation of the appellant's performance, and leave very little to his supervisors' subjective interpretation. *See* AF, Tab 13 at 30-34. Consistent with other cases where the Board has sustained the validity of numeric performance standards, I find the appellant's performance standards are reasonable and realistic. *See, e.g.*, Thomas v. Department of Defense, 95 M.S.P.R. 123, ;; 12-15 (2003) (finding the number of excused variances was reasonable); Thompson v. Department of the Navy, 89 M.S.P.R. 188, ;; 7-9 (2001) (sustaining an accuracy rate of over 97% on each critical element evaluated).

Thus, I find the agency has demonstrated by substantial evidence that it communicated the critical elements and performance standards of his position and that those standards were valid.

2. *The agency notified the appellant of his inadequate performance.*

As set forth above, the agency must demonstrate by substantial evidence that it notified the appellant of the inadequacies associated with his performance. *See Towne*, 120 M.S.P.R. 239, ¶ 8; 5 C.F.R. § 432.104.  Here, it is undisputed the agency warned the appellant during his April 2018 mid-year review that failure to

13

improve his performance could lead to an ODAP. *See* AF, Tab 13 at 63-64. Likewise, it is undisputed that Ms. Mellies issued the appellant an ODAP memorandum on June 19, 2018, which notified the appellant that his performance was unacceptable in three CJEs – Communication, Teamwork and Cooperation, and Technical Proficiency. AF, Tab 13 at 25. The ODAP also provided several examples of the appellant's prior poor performance. *Id.* at 26-27. Thus, I find the agency adequately placed the appellant on notice of his performance deficiencies.

   3. *The agency provided the appellant with a reasonable opportunity to improve his performance.*

The agency must also demonstrate by substantial evidence that it provided the appellant a reasonable opportunity to improve prior to initiating a performance-based removal or demotion under chapter 43. *See Towne*, 120 M.S.P.R. 239, ¶ 8; 5 C.F.R. § 432.104. The Board has described this opportunity to improve as a substantive, rather than a procedural, right. *Towne*, 120 M.S.P.R. 239, ¶ 8. In determining whether the appellant has been afforded a reasonable opportunity to improve, the Board will look to the nature and duties of the position, the performance deficiencies involved, and the amount of time which is sufficient to enable the employee to demonstrate acceptable performance. *Id.*

Additionally, in order to demonstrate an appellant received a bona fide opportunity to improve, the agency must prove both that it communicated the standards against which the employee's performance is to be measured, *see Chang v. Department of Education*, 30 M.S.P.R. 160, 161 (1986), and that it gave the employee adequate instructions regarding the manner in which he is expected to perform the duties of his position prior to holding him accountable for deficiencies in such performance. *See Shuman v. Department of the Treasury*, 23 M.S.P.R. 620, 632 (1984*)*.

Indeed, for each element in which the employee's performance is unacceptable, the agency must afford the employee a reasonable opportunity to

14

demonstrate acceptable performance, and should offer assistance to the employee in improving unacceptable performance.   5 U.S.C. §§ 4302(b)(5) and (6). *See also Jones v. National Gallery of Art,* 36 M.S.P.R. 602, 604, *aff'd,* 864 F.2d 148 (Fed. Cir. 1988) (Table); *Shuman,* 23 M.S.P.R. at 623.   There is no mechanical requirement regarding the form that such assistance to an employee should take.   *See Gjersvold v. Department of the Treasury*, 68 M.S.P.R. 331, 336 (1995).

Executive Order (E.O.) 13839 and Length of the Agency's ODAP

Here, the agency placed the appellant on a 30-day ODAP.   *See* AF, Tab 13 at 25.   Specifically, in its proposal notice, the agency stated it did so "[i]n accordance with Executive Order 13839[.]"   *Id.*   On appeal, the appellant has asserted the agency's reliance on E.O. 13898 in determining to place him on a 30-day ODAP rendered the length of his ODAP unreasonably short.   *See* AF, Tab 35 at 30-31.[2]   At issue is Section 4(c) of the E.O., which provides that no agency shall:

> generally afford an employee more than a 30-day period to
> demonstrate acceptable performance under section 4302(c)(6) of title
> 5, United States Code, except when the agency determines in its sole
> and exclusive discretion that a longer period is necessary to provide
> sufficient time to evaluate an employee's performance.

---

2 The appellant styled this argument as an affirmative defense.   *See* AF, Tab 1 at 5; Tab 35 at 30-31.   Nevertheless, as I previously informed the parties, I find his assertions in this regard are more appropriately analyzed as a challenge to the agency's burden of proof with respect to the reasonableness of the improvement period it provided here. *See* AF, Tab 22 at 12-14.

15

*See* E.O. 13839.[3]   The appellant argued that Ms. Eide's refusal to type her handwritten notes from the "Etowah" site visit for his review and her alleged imposition of a four-bullet point requirement for conclusions related to lengthy interviews such as "Soto" negatively impacted his ability to timely finalize those MORs. *See* AF, Tab 35 at 30-31.   According to the appellant, on July 3, 2018, he requested an extension of time to complete the "Etowah" MOR, which was denied by Ms. Eide. *Id.* at 30.   For these reasons, the appellant suggested the 30-day length of the ODAP was insufficient to demonstrate acceptable performance. *See generally id.*

I find the language of Section 4(c) of E.O. 13839 does not conflict with 5 U.S.C. § 4302(b), 5 U.S.C. § 7701(c)(1)(A), or the Board's case law. Indeed, while the E.O. can be said to express a preference for 30-day opportunity periods, it does not remove management's ability to select a longer period if "necessary to provide sufficient time to evaluate an employee's performance." *See* E.O. 13839. Thus, where the nature and complexity of an employee's position, or other factors, warrant a longer period in which to demonstrate acceptable performance, agencies are permitted to exceed the 30-day period. *See id.* I find this consistent the Board's case law with respect to determining the proper length of an opportunity period.   For example, in determining whether an agency has afforded an employee a reasonable opportunity to demonstrate acceptable performance, the

---

3 In an order issued May 6, 2019, I informed the parties that Section 4(c) of E.O. 13839 had been invalidated by an August 25, 2018 injunction in the U.S. District Court for the District of Columbia. *See American Federation of Government Employees, AFL-CIO, et al., v. Trump, et al.*, 318 F.Supp 3d 370 (D. D.C. 2018); AF, Tab 22 at 12.   Subsequent to the hearing in this appeal, on July 16, 2019, the U.S. Court of Appeals for the District of Columbia Circuit reversed and vacated the District Court's ruling. *See American Federation of Government Employees, AFL-CIO, et al., v. Trump, et al.*, 929 F.3d 748 (D.C. Cir. 2019), *rehearing en banc denied* (September 25, 2019).   Thus, the injunction precluding Section 4(c) from taking effect was lifted on October 2, 2019.   Therefore, I find no error in the agency's reference to or reliance upon that section of E.O. 13839 stemming from the August 2018 District Court ruling.

16

Board has held that relevant factors include the nature of the duties and responsibilities of the employee's position, the performance deficiencies involved, and the amount of time which is sufficient to enable the employee with an opportunity to demonstrate acceptable performance. *See Lee*, 115 M.S.P.R. 533, ¶32 (citing *Macijauskas v. Department of Army*, 34 M.S.P.R. 564, 566 (1987), *aff'd*, 847 F.2d 841 (Fed. Cir. 1988)). Thus, I find nothing improper regarding the agency's reference of or reliance upon E.O. 13839 in selecting the length of the appellant's ODAP, as doing so does not change the agency's ultimate burden of proof in this regard.

Here, I find the agency's decision to impose a 30-day opportunity period did not render the ODAP unreasonable. As discussed above, as a Program Analyst, the appellant was required to timely draft and review MORs relative to site visit interviews. He was also required to work collaboratively with members of his team and complete other analytical writing assignments within established deadlines. While such duties undoubtedly require critical thinking and involve analyses of varied complexity, I note they can also be objectively assessed in terms of timeliness of completion, accuracy, and grammatical proficiency. Moreover, because the agency's Standard Operating Procedure (SOP) with respect to MORs indicated that most should be completed within three business days of the relevant interview, I find the schedule of MOR assignments in the appellant's ODAP reasonably reflected the pace of the work performed in his organization. I find this was especially true given that most of the MORs he was to complete during the ODAP were already drafted and needed only minor revisions, and none of his ODAP assignments required him to "start from scratch." *See* HD1 (testimony of Mellies).

I note the Board has also found a 30-day performance period sufficient upon examination of the relevant factors. *See Towne v. Department of the Air Force*, 120 M.S.P.R. 239, ¶¶ 10-16 (2013) (*Towne*). Notably, the appellant in *Towne* served as a GS-5 level Secretary and her position required her to perform

17

standard clerical tasks and provide administrative support. *Id.* at ¶11. The Board also noted that the appellant's performance deficiencies were "obvious rather than subtle." *Id.* at ¶ 12. Additionally, in *Towne*, the agency extended the 30-day performance improvement period (PIP) to account for leave the appellant took over the winter holidays. *Id.* at ¶10. Other Board cases have also held that a 30-day improvement period can satisfy an agency's obligation to provide a reasonable opportunity to demonstrate acceptable performance. *See Melnick v. Department of Housing and Urban Development*, 42 M.S.P.R. 93, 101 (1989) (appellant was a GS-5 Secretary); and *Wood v. Department of the Navy*, 27 M.S.P.R. 659, 662-63 (1985) (appellant was a GS-4 Military Personnel Clerk). Here, the appellant was a GS-11 level Program Analyst; thus, I find the duties of his position were significantly more advanced from those of a GS-5 Secretary or a GS-4 Military Personnel Clerk. *See Towne*, 120 M.S.P.R. 239, ¶¶ 11; *Melnick*, 42 M.S.P.R. at 101; *Wood*, 27 M.S.P.R. at 662-63. Nevertheless, I find the appellant was not tasked with performing the full breadth of his typical assignments with respect to the MORs – arguably the crux of the ODAP – at issue, as discussed above. Rather, with limited exceptions, he was required only to finalize previous drafts of MORs and MOR conclusions, some of which could have been completed by merely addressing the comments of the reviewer.

Additionally, both Ms. Mellies and Ms. Martell testified that 30 days was a sufficient length of time to complete the assignments within the ODAP. *See* HD1 (testimony of Mellies and Martell). As the proposing and deciding officials in the appellant's removal action, I find they had an interest in claiming that the length of the ODAP was sufficient. *See Hillen v. Department of the Army*, 35 M.S.P.R. 453, 458 (1987) (holding that in order to resolve credibility issues, an administrative judge must identify the factual questions in dispute, summarize the evidence on each disputed question, state which version she believes, and explain in detail why she found the chosen version more credible, considering such factors as: (1) the witness's opportunity and capacity to observe the event or act

18

in question; (2) the witness's character; (3) any prior inconsistent statement by the witness; (4) a witness's bias, or lack of bias; (5) the contradiction of the witness's version of events by other evidence or its consistency with other evidence; (6) the inherent improbability of the witness's version of events; and (7) the witness's demeanor.  Nevertheless, I also observed that both Ms. Mellies and Ms. Martell provided straightforward testimony I found sincere, particularly since it was consistent with the evidence of record detailing the appellant's specific ODAP assignments.  *See Hillen*, 35 M.S.P.R. at 458 (consistency with other evidence; demeanor); *see also* HD1 (testimony of Mellies and Martell). Importantly, the appellant did not testify at the hearing; therefore, the testimony of Ms. Mellies and Ms. Martell on this point was also unrebutted.  *See Hillen*, 35 M.S.P.R. at 458 (consistency with other evidence).

<u>Communication of Standards and Instructions Provided to the Appellant</u>

It is undisputed the agency's June 19, 2018 ODAP memorandum contained a description of the standards by which the agency would evaluate the appellant during the 30-day ODAP.  AF, Tab 13 at 30-34.  The appellant, however, has asserted that these standards were absolute or otherwise improper, and that the agency failed to adequately instruct him with respect to its expectations of his performance.

Ms. Mellies testified she created the performance standards within the ODAP memorandum in order to ensure that the appellant's performance during the ODAP period was measurable.  HD1 (testimony of Mellies).  Under CJE 1, Communication, she tasked the appellant with finalizing 13 outstanding MORs, at a submission rate of three MORs per week of the ODAP.  AF, Tab 13 at 31.  Each MOR submitted by the appellant could have no more than two "significant revisions" required upon review.  *Id.* at 30.  The ODAP memorandum stated that "a significant revision occurs where the written submission requires more than minimal as to one or more paragraphs. Rework includes, but is not limited to,

19

changes in the analytical framework, editing redundancies, spelling/ grammatical errors, and formatting changes." *Id.* at 30. Additionally, the appellant was to meet any established deadlines with 95% accuracy. *Id.* at 30.

The appellant argued the agency's standards were absolute. For example, he claimed that even if he submitted just one MOR outside the established deadline, this would result in less than the 95% accuracy required by the ODAP. I agree with the appellant that if 12 of 13 MORs were timely submitted, the rate of accuracy would be 92.3%, which is less than 95%. Nevertheless, as discussed below, I find the appellant was ultimately untimely with respect to far more MOR deadlines than one; indeed, the agency's tracking log reflects 8 MORs were not finalized by the relevant deadline. *See* AF, Tab 46 at 232-233. Additionally, Ms. Mellies credibly testified that had the appellant ultimately had only one deficiency with respect to timeliness under CJE 1, she would have been "lenient" regarding her assessment of his performance under the ODAP. *See* HD1 (testimony of Mellies). For these reasons, I find the agency's standards were not unattainable under these circumstances.

Similarly, I find the appellant's argument that minor grammatical errors within a paragraph could ultimately constitute a "significant revision" was not supported by the relevant evidence and testimony. Indeed, the ODAP clearly defined for the appellant what Ms. Mellies would consider "significant" in this regard. AF, Tab 13 at 30. Specifically, it stated, "Significant revision occurs where the written submission requires more than minimal rework as to one or more paragraphs. Rework includes, but is not limited to, changes in the analytical framework, editing redundancies, spelling/ grammatical errors, and formatting changes." *Id.* I find this language inconsistent with the appellant's concern regarding minor errors. Moreover, upon review of the record and having observed the testimony of Ms. Mellies, I find no indication she evaluated the appellant in an unfair or heavy-handed manner with respect to this requirement.

20

The appellant also asserted the agency improperly changed the requirements of the relevant SOP during the ODAP with respect to conclusions in MORs. Specifically, he claimed Ms. Eide imposed a requirement that he include four bullet points in his conclusions for MORs where the interview in question was more lengthy than usual. Ms. Eide testified that this was not a requirement, but rather guidance as to how to effectively draft an appropriate conclusion and that using this technique could help the appellant finalize his work more quickly. *See* HD1 (testimony of Eide). I find Ms. Eide's testimony credible and unrebutted. Even assuming Ms. Eide's guidance regarding a fourth bullet point did impose a new requirement, I find no indication that it would have added significantly to his ODAP assignments so as to render his opportunity to improve unreasonable.

Under CJE 4, Teamwork and Cooperation, the ODAP required the appellant to resolve any disagreements 90% of the time, work constructively with his superiors (Chief Inspector, Lead Inspector and Senior Inspector) to reach "mutually acceptable agreements" that would move a project forward 95% of the time, and hold meetings with team members as necessary when seeking assistance. AF, Tab 13 at 31-32. To the extent the appellant suggested Ms. Mellies could not properly evaluate his performance under this CJE, I find this argument unsupported for the reasons discussed above.

Under CJE 5, Technical Proficiency, the appellant was to complete four analytical projects at a rate of one per week of the ODAP period. AF, Tab 13 at 34. The appellant challenged this standard on the grounds that he had requested approval to complete "data analytics" training on two occasions prior to the issuance of the ODAP, but was denied. However, both Ms. Mellies and Ms. Martell credibly testified that the appellant's work did not require "data analytics" skills. *See* HD1 (testimony of Eide, Mellies, and Martell). Rather, they required the appellant to determine how best to filter down a sample size and filter Microsoft Excel files through what Ms. Eide described as "counting

21

exercises." *See* HD1 (testimony of Eide and Mellies). Ms. Martell also testified that very few projects require that skillset and also recalled that the courses were "very expensive." *See id.* (testimony of Martell). I credit the testimony of Ms. Eide, Ms. Mellies, and Ms. Martell, which was consistent on the inapplicability of the data analytics training to the appellant's job. *See Hillen*, 35 M.S.P.R. at 458 (capacity to observe the event in question; consistency of testimony). Thus, I find the agency's failure to provide the appellant with "data analytics" training did not impact his ability to succeed under the ODAP.

Assistance Provided to the Appellant

Ms. Mellies issued the appellant the ODAP on June 19, 2018. AF, Tab 13 at 25. According to the ODAP document itself, Ms. Mellies and the agency intended to (1) assist the appellant with setting priorities; (2) meet weekly with the appellant to discuss "the quality and timeliness of [his] work, [his] progress, and [his] overall job performance; (3) provide on-the-job assistance and feedback; and (4) provide the appellant with coaching regarding how to meet the "Achieved Expectations" performance level. *See id.* at 27-28. At the hearing, Ms. Mellies credibly testified that she met with the appellant every Wednesday during the ODAP, with the exception of one week when she was away on vacation. HD1 (testimony of Mellies). During that week, Ms. Mellies stated that the meeting still occurred with Ms. Eide filling in for her. *Id.* Ms. Mellies recalled that her purpose in holding these meetings was to discuss the appellant's performance from the prior week and to review the upcoming week's assignments. *Id.* She explained she created an "assignment log" and shared it with the appellant each week for tracking purposes. *Id. See also* AF, Tab 46 at 232-237. Ms. Mellies also testified that at the end of every ODAP meeting, she asked the appellant if there was anything he needed or any way in which she could help him. HD1 (testimony of Mellies). According to Ms. Mellies, the appellant always responded in the negative. *Id.*

22

The appellant did not testify at the hearing and, thus, Ms. Mellies' testimony described above was unrebutted. *See* HD1 (testimony of Mellies). Moreover, I find no reason to doubt Ms. Mellies' testimony regarding her significant assistance provided to the appellant during the ODAP. Thus, I find the agency demonstrated by substantial evidence that it offered assistance to the appellant as part of his performance improvement period.

Thus, after carefully considering the specific circumstances presented here, I find the agency established by substantial evidence that its ODAP was reasonable.

The agency demonstrated by substantial evidence that the appellant's performance remained unacceptable at the conclusion of the ODAP.

Finally, the agency must prove by substantial evidence that the appellant's performance remained unacceptable in at least one critical element at the end of his performance improvement period. *See Sanders v. Social Security Administration*, 114 M.S.P.R. 487, ¶ 11 (2010). The agency's burden of providing evidence of the appellant's unacceptable performance can be met largely by submissions of documentation through the charges and the appellant's working papers. *See Fernand v. Department of the Treasury*, 100 M.S.P.R. 259, ¶ 10.

During the ODAP period, Ms. Mellies observed the appellant was not timely in the submission of his assigned MORs. HD1 (testimony of Mellies). She stated he did not finalize the MORs by the established deadlines, and that this was evident within the first week of the ODAP. As such, Ms. Mellies expressed concern to the appellant about the negative impacts of his untimeliness. *See id.* She also found errors in the work product submitted by the appellant during the ODAP, such as the omission of relevant information from MORs. With respect to three of the MORs where the appellant was the assigned drafter, he failed to timely submit the MORs for review. *See id.* In the "Soto" and "Gonzalez" MORs, where the appellant was the reviewer, Ms. Mellies discovered incorrect

23

information in the appellant's conclusions.  Further, Ms. Mellies noted he was not receptive to feedback from Ms. Eide or Ms. Ruth, including both email communications and comments that he failed to address within his MORs.  *See id.*  For example, instead of addressing a comment on a MOR, the appellant added a new comment expressing disagreement with the original comment.  Similarly, he engaged in a debate with Ms. Eide as to whether he could look up an acronym used during a field interview or re-engage the component.  *See id.*

Ms. Martell testified she carefully reviewed the appellant's proposed removal and the information provided to her along with it.  HD1 (testimony of Martell).  She stated that, after performing her own review of the appellant's work during the ODAP and cross-referencing her conclusions with the assignment log created by Ms. Mellies, she concluded the appellant had failed to improve his performance to the "Achieved Expectations" level.  *See id.*  In her decision letter, Ms. Martell specifically addressed her findings with respect to each of the three CJEs at issue in the appellant's ODAP. AF, Tab 10 at 39.  Regarding CJE 1, she stated, "[A]fter reviewing 13 MORs assigned you to finalize as part of your Performance Improvement Plan, 8 MORs were untimely and required significant revisions, at least 2 MORs had inaccurate information, and one was not submitted."  *Id.*  Regarding CJE 4, Ms. Martell agreed with Ms. Mellies' conclusion that the appellant "did not maintain a collaborative environment or resolve disagreements constructively in 3 out of 5 meetings during your Opportunity to Demonstrate Acceptable Performance period."  *Id.*  She also referenced an incident wherein the appellant confronted her and Ms. Eide about a write up for the "Etowah" walk through and stated he did not work constructively to resolve that incident.  *Id.*  Finally, regarding CJE 5, she determined the appellant "turned in work products that were incomplete, did not finalize the work after being provided clear directions to do so, and did not submit one task out of 4 tasks assigned to you."  *Id.*

24

I find the record contains extensive documentary evidence supporting Ms. Martell's ultimate assessment of the appellant's performance during the ODAP. *See* AF, Tab 10 at 179-180; Tab 11 at 6-605; Tab 12 at 6-389; Tab 13 at 6-13; Tab 46 at 232-237 (assignment log). With respect to the assigned MORs under CJE 1, I note the appellant often submitted the MOR in question to the reviewer on the deadline date established by his ODAP. *See* AF, Tab 46 at 232-233. On several of those occasions, the assignment log reflects the reviewer did not have adequate time to finalize the MOR on that date. *See id.* I find the appellant's ODAP required him to "finalize" the MORs in question. AF, Tab 13 at 31. Additionally, on June 25, 2018, Ms. Mellies emailed the appellant and "highly recommend[ed]" that he submit his MORs to the reviewer before the ultimate due date. AF, Tab 12 at 359. Thus, I find Ms. Mellies and Ms. Martell appropriately deemed the appellant's performance deficient in the instances whereupon he submitted a MOR to the reviewer on the due date, but could not be finalized that same day. *See* AF, Tab 46 at 232-233. I find this is especially true with respect to the MORs the appellant submitted at or near the end of the workday on the day of the established deadline. *See id.* at 233.

I also considered the appellant's argument that Ms. Mellies could not appropriately evaluate his work on the relevant MORs because she was not present for the interviews from which they stemmed and/or the ICE Removals team meetings. Ms. Mellies testified she reviewed meeting notes and received feedback from Ms. Eide and, to some extent, Ms. Ruth, regarding the appellant's performance. *See* HD1 (testimony of Mellies). She also noted she was able to review the appellant's work product in the agency's systems. *See id.* Additionally, Ms. Costello testified that supervisors have "wide latitude" in determining how best to supervise employees and what meetings or interviews to attend. *See* HD2 (testimony of Costello). She stated that (as here) a supervisor can sometimes be assigned to a different team than an employee, in which case the supervisor must consult closely with the Team Lead and others to assess the

25

employee's performance.  *See id.*  I credit the testimony of Ms. Mellies and Ms. Costello in this regard and find no support for a conclusion that Ms. Mellies could not adequately evaluate the appellant or that she failed to do so.

With respect to CJE 4, Teamwork and Cooperation, I credit Ms. Eide and Ms. Mellies' testimony regarding the disagreements that occurred regarding the fourth bullet point in a specific MOR conclusion as well as the appellant's insistence that Ms. Eide type up her "Etowah" walkthrough notes and send them to him.  *See* HD1 (testimony of Eide and Mellies).  I observed their testimony regarding these events as direct and dispassionate, and not indicative of any preconceived attitudes or undue bias with respect to the appellant.  *See id.  See also Hillen*, 35 M.S.P.R. at 458 (lack of bias; demeanor).  Notably, the appellant did not testify at the hearing and, therefore, the testimony of Ms. Eide and Ms. Mellies regarding these situations was unrebutted.  *See Hillen*, 35 M.S.P.R. at 458 (consistency with other evidence and/or testimony).  While I agree with Ms. Martell's testimony that the appellant's performance under CJE 4 was "harder to evaluate," *see* HD1 (testimony of Martell), I find the documentary evidence of record supports the agency's conclusion that the appellant did not work cooperatively to address these situations.  *See, e.g.*, AF, Tab 12 at 340; Tab 46 at 177-178; 234-235.  Therefore, despite the subjectivity inherent in CJE 4, I find the agency has established by substantial evidence that the appellant failed to improve his performance under this CJE during the ODAP.

Finally, with respect to CJE 5, Technical Proficiency, I agree with the determination of Ms. Mellies and Ms. Martell that the appellant did not meet the requirements of his ODAP.  *See* HD1 (testimony of Mellies and Martell).  I find the documentary evidence of record supports this determination.  Indeed, the evidence suggests the appellant's work product contained misstatements, omitted relevant information, and failed to use appropriate resources well in excess of the percentage of deficiencies permitted by the ODAP.  *See id.* at 190-196; *see also* AF, Tab 47 at 38-120.  Moreover, I find it is undisputed that the appellant did not

submit the fourth analytical project, "A.1.PRG(3), Testimony," required by the
ODAP.  *See* AF, Tab 46 at 237.  Therefore, he did not meet the ODAP
requirements with respect to that project.

Based on the foregoing, I find the appellant did not successfully complete
the improvement actions specified in his ODAP in order to demonstrate an
acceptable level of performance.  As such, I find the agency has established by
substantial evidence that it properly removed the appellant for unacceptable
performance under the provisions of Chapter 43.  Therefore, the agency's charge
of unacceptable performance is SUSTAINED.

<u>The appellant failed to establish his affirmative defenses by preponderant
evidence.</u>

    1.  *Discrimination and Retaliation Claims*

Federal employees are protected against discrimination on the bases of sex,
race, and retaliation for the exercise of Title VII rights, by 42 U.S.C. § 2000e-16.
*Savage v. Department of the Army*, 122 M.S.P.R. 612 ¶¶ 36, 37 (2015).  The Board
has held that a violation is established where the appellant shows that
discrimination or retaliation "was a motivating factor in the contested personnel
action, even if it was not the only reason."  *Id.*, ¶ 41.  In *Gardner v. Department
of Veterans Affairs*, 123 M.S.P.R. 647 (2016), the Board clarified that this analysis
does not require administrative judges to separate "direct" from "indirect"
evidence and to proceed as if such evidence were subject to different legal
standards.  Rather, the dispositive inquiry is whether the appellant has shown by
the preponderance of the evidence that the prohibited consideration was a
motivating factor in the contested personnel action.  *Savage*, 122 M.S.P.R. 612, ¶
51.

Here, the appellant raised claims of discrimination on the basis of his sex
and race.  As I have found above, however, the agency has proven by substantial
evidence that the appellant's performance was unacceptable in several critical

elements during the performance improvement period, which is the focus of the analysis in a chapter 43 performance-based action. *See, e.g., Thompson*, 122 M.S.P.R. 372, ¶ 11 (evidence of past performance not contained within a notice of proposed removal for unacceptable performance is immaterial); *Lee v. Department of Labor*, 110 M.S.P.R. 355, ¶ 11 (2008) (an agency may place an employee on a performance improvement plan at any time during an appraisal cycle if his performance becomes unacceptable). The appellant, moreover, has identified no similarly situated individuals outside his protected classes who were shown more favorable treatment under similar circumstances. With respect to sex discrimination, the appellant's claim appears to center around Ms. Ruth as a potential comparator. However, I find Ms. Ruth was a GS-13 level employee, whereas the appellant was a GS-11. More importantly, I find Ms. Ruth was not placed on an ODAP and there is no evidence suggesting her performance was deficient. With respect to his claim of race discrimination, the appellant did not establish the race of any other employees who may have received more favorable treatment than he. To the extent he has suggested that Ms. Ruth was a compatator in this regard, I find she was not for the same reasons discussed above. Likewise, to the extent the appellant has suggested that another employee, Ian Stumpf, was a compatator, I note that he was a GS-12 level employee who was not supervised by Ms. Mellies. *See* HD1 (testimony of Mellies). Ms. Mellies also testified that Mr. Stumpf was not placed on an ODAP. *Id.* Additionally, I note the appellant did not testify at the hearing, and thus, he did not provide any additional information regarding his claims of sex or race-based discrimination, and introduced no evidence in support of these claims. *See* HD1; HD2. Similarly, he did not advance any evidence or argument suggesting Ms. Mellies or Ms. Martell took his race or sex into account when assessing his performance and ultimately proposing and deciding upon his removal. *Id.* Therefore, I cannot conclude that the appellant's sex was a motivating factor in the agency's decision to remove him for unacceptable performance.

28

With respect to the appellant's claim of EEO-based retaliation, the appellant did not introduce evidence of his EEO complaint or when it was filed. Nevertheless, I find that the relevant agency officials testified that they did become aware of his EEO complaint. Ms. Mellies stated she became aware of his complaint on July 9, 2018, when she was contacted by an EEO investigator. *See* HD1 (testimony of Mellies). Ms. Martell testified she became aware on July 9 or 10, 2018, when Ms. Mellies informed her that she (Ms. Mellies) was the subject of the appellant's complaint. *See* HD1 (testimony of Martell). The appellant introduced no evidence or testimony disputing either of these assertions. Additionally, both Ms. Mellies and Ms. Martell testified that they did not take the appellant's EEO complaint into account with respect to his removal action. I credit this testimony because I find the evidence of record reflects that the appellant's ODAP was already issued and well underway by the time Ms. Mellies and Ms. Martell became aware of any EEO activity by the appellant. *See* AF, Tab 13 at 25 (showing ODAP memorandum with issuance date of June 19, 2018).

For these reasons, I find the appellant has not established his affirmative defenses of discrimination based on sex or race, or retaliation for prior EEO activity, by preponderant evidence.

2. *Whistleblower retaliation*

Where, as here, an appellant raises whistleblowing as an affirmative defense to an agency action over which the Board has jurisdiction, the appellant must prove by preponderant evidence that he engaged in protected whistleblowing activity by making a protected disclosure that she reasonably believed evidenced one of the categories of wrongdoing listed in section 2302(b)(8), *i.e.*, a violation of any law, rule, or regulation; gross mismanagement; a gross waste of funds; an abuse of authority; or a substantial and specific danger to public health or safety. *See Shibuya v. Department of Agriculture*, 119 M.S.P.R. 537, ¶¶ 19-20 (2013). To establish he had a reasonable belief in his alleged disclosures, the appellant must prove that a disinterested observer with knowledge of the essential

facts known to and readily ascertainable by the employee could reasonably conclude that the actions of the government evidence one of the categories of wrongdoing. *Id.* The Board has held that "gross mismanagement" means a management action or inaction which creates a substantial risk of significant adverse impact upon the agency's ability to accomplish its mission. *See Cassidy v. Department of Justice*, 118 M.S.P.R. 74, ¶ 8 (2012). Such a disclosure does not include decisions that are merely debatable and must involve more than de minimis wrongdoing or negligence. *See Fisher v. Environmental Protection Agency*, 108 M.S.P.R. 296, ¶ 9 (2008); *Johnson v. Department of Justice*, 104 M.S.P.R. 624, ¶ 16 (2007).

An appellant bears the additional burden of establishing by preponderant evidence that his disclosure was a contributing factor in the challenged personnel action. *Shibuya*, 119 M.S.P.R. 537, ¶ 22. An appellant can establish the contributing factor criterion through circumstantial evidence, such as the official's knowledge of the disclosure and timing of the personnel action. *Id.; see also Agoranos v. Department of Justice*, 119 M.S.P.R. 498, ¶ 21 (2013) (personnel actions taken within 1 to 2 years of a disclosure satisfy the knowledge/timing test). Alternatively, if the appellant cannot establish contributing factor under the knowledge/timing test, the Board must consider other evidence, such as that pertaining to the strength or weakness of the agency's reasons for taking the action, whether the whistleblowing was personally directed at the proposing or deciding officials, and whether those individuals had a desire or motive to retaliate against the appellant. *See Rumsey v. Department of Justice*, 120 M.S.P.R. 259, ¶ 26 (2013); *Stiles v. Department of Homeland Security*, 116 M.S.P.R. 263, ¶ 24 (2011).

If the appellant can establish these elements by preponderant evidence, the agency must prove by clear and convincing evidence that it would have removed him even absent his disclosure(s). *See Miller v. Department of Justice*, <u>842 F.3d</u> <u>1252</u>, 1257 (Fed. Cir. 2016). Clear and convincing evidence is that measure or

30

degree of proof that produces in the mind of the trier of fact a firm belief as to the allegations sought to be established. It is a higher standard than "preponderance of the evidence" as defined in 5 CFR 1201.56(c)(2).  *See* 5 C.F.R. § 1209.4(e).

I find the record contains no evidence with respect to the appellant's alleged whistleblowing disclosures or other protected activity.  To the extent the appellant has suggested that he made disclosures to Congress or to the Council of Inspectors General on Integrity and Efficiency (CIGIE), it appears these communications occurred in December 2018, well after the ODAP period and the issuance of Ms. Mellies' proposal to remove the appellant.  *See* AF, Tab 31 at 12-13; Tab 33 at 17.  Thus, I find the appellant cannot demonstrate by preponderant evidence that these alleged disclosures/protected activity contributed to the personnel action at issue here (his removal).  Moreover, I credit the testimony of Ms. Mellies and Ms. Martell that they were unaware of these alleged communications during their respective roles in the removal process.  *See* HD1 (testimony of Mellies and Martell).  To the extent the appellant suggested he made other disclosures or engaged in other protected activity, I find he did not submit any evidence in support of such claims; as such, these claims must fail. *See* AF, Tab 31.

For these reasons, I find the appellant has failed to establish his affirmative defense of whistleblower retaliation.

3.  *Granting of an Unauthorized Advantage or Preference*

The appellant has alleged the agency granted an unfair advantage to Ms. Ruth, his coworker.  This allegation stems from a statement made by Ms. Mellies indicating she had to "reserve certain leadership opportunities" for Ms. Ruth because she faced competition in advancing from the GS-13 to the GS-14 level, while the appellant was in a career-ladder position and thus "only in competition with [himself]."  *See* AF, Tab 20 at 9, 132.  The appellant claimed this represented a violation of 5 U.S.C. § 2302(b)(6), a prohibited personnel practice.

31

In order to establish a violation under 5 U.S.C. § 2302(b)(6), the appellant must show an intentional or "purposeful taking of a personnel action in such a way as to give a preference to a particular individual for the purposes of improving her prospects for employment." *See, e.g., Special Counsel v. Byrd*, 59 M.S.P.R. 561, 570 (1993) (citing *Baum v. Department of the Treasury*, 14 M.S.P.R. 392, 395 (1983), *aff'd*, 727 F.2d 1117 (Fed. Cir. 1983) (Table)).   Thus, a violation requires a finding of intentional conduct undertaken for an improper purpose.   *See, e.g., Special Counsel v. Spears*, 75 M.S.P.R. 639, 655 (1997) (absent improper purpose, discretionary decisions by supervisors do not constitute favoritism, preferential treatment, or abuse of authority); *Special Counsel v. Byrd*, 59 M.S.P.R. at 570 (violation of § 2302(b)(6) requires intentional or purposeful action).

Ms. Eide testified she reserved certain developmental opportunities for Ms. Ruth.   HD1 (testimony of Eide).   For example, she said she allowed Ms. Ruth to ask more questions during interviews, permitted her to conduct component follow-ups, and asked her to complete administrative tasks she (Ms. Eide) would have otherwise completed.   *See id.*   Ms. Ruth was also given the authority to assign work to the appellant, a lower-graded teammate, and provide him with mentoring and feedback.   *See id.*   Ms. Eide explained that GS-13 employees such as Ms. Ruth had to compete for promotions to the GS-14 level.   She stated that a GS-13 could not effectively compete for a GS-14 position without demonstrating that he or she could work at the GS-14 level.   *See id.*   Thus, Ms. Eide said the AIG felt it was important to give current GS-13 employees opportunities to gain that experience.   *See id.*

Jennifer Costello, the agency's AIG, testified she received a request that GS-13 level employees be permitted to engage in developmental duties in order to prepare them for potential promotion to the GS-14 level.   HD2 (testimony of Costello).   She recalled that she thought this was a good idea because some GS-13s were getting "stuck" at that grade level.   *See id.*   Thus, she informally

implemented the suggestion as a "pilot" for GS-13 employees who were interested in performing higher-graded duties. *See id.*

> Pursuant to 5 U.S.C. § 2302, a "personnel action" includes
>
> a decision concerning pay, benefits, or awards, or concerning education or training if the education or training may reasonably be expected to lead to an appointment, promotion, performance evaluation, or other action described in this subparagraph[]

5 U.S.C. § 2302(a)(2)(A)(ix). I find the undisputed testimony of Ms. Eide and Ms. Costello demonstrates Ms. Ruth and other GS-13 employees were permitted to perform higher-graded duties in order to improve their odds of successfully competing for a promotion to the GS-14 level. *See* HD1 (testimony of Eide); HD2 (testimony of Costello). I find the assignment of such developmental duties is akin to providing training opportunities. I further find that performing those duties could reasonably be expected to lead to a promotion; indeed, agency officials stated the goal was to ease the path to promotion from the GS-13 level to the GS-14 level. *See* HD1 (testimony of Eide); HD2 (testimony of Costello). Therefore, I find the appellant established that a personnel action occurred as defined by the relevant statute. *See* 5 U.S.C. § 2302. Likewise, I find the action with respect to Ms. Ruth was clearly intentional. *See Byrd*, 59 M.S.P.R. at 570.

Nevertheless, I find the appellant has not established an improper purpose with respect to the agency's actions. The appellant introduced no evidence suggesting that any preference gained by Ms. Ruth or other GS-13 employees from the training opportunities provided by the agency was unauthorized. Similarly, I am unaware of any law, rule or regulation prohibiting an agency from providing developmental opportunities to its employees, whether formally or informally, nor has the appellant identified any authorities containing such prohibitions. As such, I find no basis to conclude the agency's actions were taken for an improper purpose. *See Spears*, 75 M.S.P.R. at 655.

Moreover, the appellant asserted that the agency gave preference to Ms. Ruth because she was part of a particular category of employees – those who

33

were at the GS-13 level.  The Board has generally not viewed the language of section 2302(b)(6) broadly enough to cover such an allegation; rather, the Board interprets section 2302(b)(6) to cover situations where the prospects of a specific person are injured or improved by an unauthorized preference.  *See Avery v. Office of Personnel Management*, 94 M.S.P.R. 212, ¶ 5 (2003).  Here, it is evident the additional opportunities were made available to interested GS-13 level employees, including but not limited to Ms. Ruth.

For these reasons, I find the appellant has failed to establish a violation of 5 U.S.C. § 2302(b)(6) by preponderant evidence.[4]

4.  *Harmful Procedural Error*

Harmful error is defined as an "[e]rror by the agency in the application of its procedures that is likely to have caused the agency to reach a conclusion different from the one it would have reached in the absence or cure of the error." 5 C.F.R. § 1201.4(r).  The burden is upon the appellant to show that the agency committed an error and that the error was harmful, *i.e.*, that it caused substantial prejudice to his rights.  *Id.*

The appellant alleged the agency engaged in harmful error by selecting Ms. Martell as the deciding official with respect to Ms. Mellies' proposal to remove him.  *See* AF, Tab 31 at 15.  He claimed that because Ms. Martell was involved in a dispute between him and Ms. Ruth regarding a conference call, she was unable to make an impartial decision regarding his proposed removal.  *See id.*  Similarly,

---

4 Even if the appellant could establish such a violation, I note the appellant advanced no evidence or argument explaining how the preference given to Ms. Ruth affected his ability to demonstrate acceptable performance under the ODAP or his performance plan in general.  To the extent the appellant suggested that developmental opportunities that could have improved his performance were withheld from him because they were given to Ms. Ruth, I find the evidence and testimony of record does not support such a conclusion.  *See, e.g.*, HD1 (testimony of Eide) (stating that GS-11 employees were not asked to perform "teammate setup" duties, but GS-13 employees were); HD2 (testimony of Costello) (explaining that a GS-11 employee would not be tasked with the same assignments as a GS-13 employee).

he argued Ms. Martell should not have served as the deciding official because of her role as Chief Inspector on the ICE Removals project and due to the fact she was named in the proposed removal as one of the individuals the appellant "had a run in with." *See id.*

Ms. Martell testified the appellant once came to her office and asking to speak with her. HD1 (testimony of Martell). She recalled she was leaving for a meeting but went to the appellant's office later to discuss his concern, which she remembered as involving an email from Ms. Ruth which asserted the appellant had called in late to a conference call. *Id.* According to Ms. Martell, the appellant was upset because he had not been late to the call. She testified she told him he was not considered late and that no one was "in trouble" due to what had occurred. *See id.* Ms. Martell said she later spoke with Ms. Ruth to inform her that she had overreacted by accusing the appellant of being tardy to the conference call. *See id.* Additionally, Ms. Martell recalled having both Ms. Ruth and the appellant come to her office together. She stated she gave both employees an opportunity to tell their side of the story, and remembered Ms. Ruth apologizing "profusely." *See id.* Ultimately, Ms. Martell indicated the situation was a "non-event in [her] supervisory life" that did not "color [her] objectivity" in the decision-making process with respect to the appellant's proposed removal. HD1 (testimony of Martell).

The appellant did not testify at the hearing. *See* HD1 and HD2. Thus, I find Ms. Martell's testimony regarding her meeting with the appellant and her subsequent meeting with both him and Ms. Ruth undisputed. *See* HD1 (testimony of Martell). Moreover, Ms. Martell testified in a composed, straightforward manner with respect to her handling of the conference call issue. *Id.* I also observed the entirety of Ms. Martell's testimony and found no indication in her effect or demeanor that would suggest she was incapable of making an unbiased decision regarding the appellant's proposed removal due to her involvement in the conference call issue. HD1 and HD2 (testimony of Martell); *see also Hillen v.*

35

*Department of the Army*, 35 M.S.P.R. 453, 458 (1987) (In order to resolve credibility issues, an administrative judge must identify the factual questions in dispute, summarize the evidence on each disputed question, state which version she believes, and explain in detail why she found the chosen version more credible, considering factors including the witness's opportunity and capacity to observe the event or act in question; the contradiction of the witness's version of events by other evidence or its consistency with other evidence; and the witness's demeanor.)

To the contrary, Ms. Martell's unrebutted testimony reflected she took her role as deciding official seriously and took pains to evaluate the relevant materials fully and fairly. For example, she stated she reviewed the evidence provided to her and created her own spreadsheet, which she then checked against that submitted by Ms. Mellies. HD1 (testimony of Martell). I find such actions inconsistent with a deciding official who might harbor inappropriate bias against an employee due to knowledge of or involvement in an unrelated matter.

Ms. Martell was also allegedly involved in the dispute between the appellant and Ms. Eide regarding the "Etowah" site visit. *See* AF, Tab 31 at 15. The proposed removal signed by Ms. Mellies suggests the appellant and Ms. Eide became engaged in a "confrontation" over whether Ms. Eide should type up her notes from the walk-through and send them to appellant. According to the proposal, Ms. Martell ultimately became involved in the situation. *See* AF, Tab 10 at 129 ("Again, you insisted that Ms. Eide type her notes for you. This turned into a confrontation, also involving Chief Inspector, Tatyana Martell.") Ms. Martell testified that she recalled an issue regarding "notes" as related to the appellant's ODAP assignments. HD1 (testimony of Martell). Nevertheless, no further testimony was elicited on this point. *See id. See also* HD2 (testimony of Martell). Moreover, I find Ms. Martell's decision letter thoroughly considered the arguments raised by the appellant as well as the proposal and the materials submitted therewith. AF, Tab 10 at 36-38.

For these reasons, I find the appellant has failed to establish that the agency committed an error in the application of its policies or procedures.   Even assuming that he did so, I further find the appellant has failed to demonstrate how a different deciding official would have reached a different conclusion regarding his performance during the ODAP.   Thus, I find the appellant cannot meet his burden of proof to establish an affirmative defense of harmful procedural error.

Decision

Based on the foregoing, the agency's removal action for unacceptable performance under Chapter 43 is AFFIRMED.


FOR THE BOARD:            _____/S/_____
                         Lindsay Young Harrell
                         Administrative Judge

### NOTICE TO APPELLANT

This initial decision will become final on **May 20, 2020**, unless a petition for review is filed by that date.   This is an important date because it is usually the last day on which you can file a petition for review with the Board.   However, if you prove that you received this initial decision more than 5 days after the date of issuance, you may file a petition for review within 30 days after the date you actually receive the initial decision.   If you are represented, the 30-day period begins to run upon either your receipt of the initial decision or its receipt by your representative, whichever comes first.   You must establish the date on which you or your representative received it. The date on which the initial decision becomes final also controls when you can file a petition for review with one of the authorities discussed in the "Notice of Appeal Rights" section, below. The paragraphs that follow tell you how and when to file with the Board or one of those authorities. These instructions are important because if you wish to file a petition, you must file it within the proper time period.

BOARD REVIEW

37

You may request Board review of this initial decision by filing a petition for review.

If the other party has already filed a timely petition for review, you may file a cross petition for review. Your petition or cross petition for review must state your objections to the initial decision, supported by references to applicable laws, regulations, and the record. You must file it with:

The Clerk of the Board
Merit Systems Protection Board
1615 M Street, NW.
Washington, DC 20419

A petition or cross petition for review may be filed by mail, facsimile (fax), personal or commercial delivery, or electronic filing. A petition submitted by electronic filing must comply with the requirements of 5 C.F.R. § 1201.14, and may only be accomplished at the Board's eAppeal website (https://eappeal.mspb.gov).

NOTICE OF LACK OF QUORUM

The Merit Systems Protection Board ordinarily is composed of three members, 5 U.S.C. § 1201, but currently there are no members in place. Because a majority vote of the Board is required to decide a case, *see* 5 C.F.R. § 1200.3(a), (e), the Board is unable to issue decisions on petitions for review filed with it at this time. *See* 5 U.S.C. § 1203. Thus, while parties may continue to file petitions for review during this period, no decisions will be issued until at least two members are appointed by the President and confirmed by the Senate. The lack of a quorum does not serve to extend the time limit for filing a petition or cross petition. Any party who files such a petition must comply with the time limits specified herein.

For alternative review options, please consult the section below titled "Notice of Appeal Rights," which sets forth other review options.

## **Criteria for Granting a Petition or Cross Petition for Review**

38

Pursuant to 5 C.F.R. § 1201.115, the Board normally will consider only issues raised in a timely filed petition or cross petition for review. Situations in which the Board may grant a petition or cross petition for review include, but are not limited to, a showing that:

(a) The initial decision contains erroneous findings of material fact. (1) Any alleged factual error must be material, meaning of sufficient weight to warrant an outcome different from that of the initial decision. (2) A petitioner who alleges that the judge made erroneous findings of material fact must explain why the challenged factual determination is incorrect and identify specific evidence in the record that demonstrates the error. In reviewing a claim of an erroneous finding of fact, the Board will give deference to an administrative judge's credibility determinations when they are based, explicitly or implicitly, on the observation of the demeanor of witnesses testifying at a hearing.

(b) The initial decision is based on an erroneous interpretation of statute or regulation or the erroneous application of the law to the facts of the case. The petitioner must explain how the error affected the outcome of the case.

(c) The judge's rulings during either the course of the appeal or the initial decision were not consistent with required procedures or involved an abuse of discretion, and the resulting error affected the outcome of the case.

(d) New and material evidence or legal argument is available that, despite the petitioner's due diligence, was not available when the record closed. To constitute new evidence, the information contained in the documents, not just the documents themselves, must have been unavailable despite due diligence when the record closed.

As stated in 5 C.F.R. § 1201.114(h), a petition for review, a cross petition for review, or a response to a petition for review, whether computer generated, typed, or handwritten, is limited to 30 pages or 7500 words, whichever is less. A reply to a response to a petition for review is limited to 15 pages or 3750 words, whichever is less. Computer generated and typed pleadings must use no less than

39

12 point typeface and 1-inch margins and must be double spaced and only use one side of a page. The length limitation is exclusive of any table of contents, table of authorities, attachments, and certificate of service. A request for leave to file a pleading that exceeds the limitations prescribed in this paragraph must be received by the Clerk of the Board at least 3 days before the filing deadline. Such requests must give the reasons for a waiver as well as the desired length of the pleading and are granted only in exceptional circumstances. The page and word limits set forth above are maximum limits. Parties are not expected or required to submit pleadings of the maximum length. Typically, a well-written petition for review is between 5 and 10 pages long.

　　If you file a petition or cross petition for review, the Board will obtain the record in your case from the administrative judge and you should not submit anything to the Board that is already part of the record.  A petition for review must be filed with the Clerk of the Board no later than the date this initial decision becomes final, or if this initial decision is received by you or your representative more than 5 days after the date of issuance, 30 days after the date you or your representative actually received the initial decision, whichever was first.  If you claim that you and your representative both received this decision more than 5 days after its issuance, you have the burden to prove to the Board the earlier date of receipt.  You must also show that any delay in receiving the initial decision was not due to the deliberate evasion of receipt. You may meet your burden by filing evidence and argument, sworn or under penalty of perjury (*see* 5 C.F.R. Part 1201, Appendix 4) to support your claim.  The date of filing by mail is determined by the postmark date.  The date of filing by fax or by electronic filing is the date of submission.  The date of filing by personal delivery is the date on which the Board receives the document.  The date of filing by commercial delivery is the date the document was delivered to the commercial delivery service.  Your petition may be rejected and returned to you if you fail to provide a statement of how you served your petition on the other party.  *See* 5 C.F.R.

40

§ 1201.4(j).  If the petition is filed electronically, the online process itself will serve the petition on other e-filers.  *See* 5 C.F.R. § 1201.14(j)(1).

A cross petition for review must be filed within 25 days after the date of service of the petition for review.

## NOTICE TO AGENCY/INTERVENOR

The agency or intervenor may file a petition for review of this initial decision in accordance with the Board's regulations.

notice OF APPEAL rights

You may obtain review of this initial decision only after it becomes final, as explained in the "Notice to Appellant" section above.  5 U.S.C. § 7703(a)(1). By statute, the nature of your claims determines the time limit for seeking such review and the appropriate forum with which to file.  5 U.S.C. § 7703(b). Although we offer the following summary of available appeal rights, the Merit Systems Protection Board does not provide legal advice on which option is most appropriate for your situation and the rights described below do not represent a statement of how courts will rule regarding which cases fall within their jurisdiction.  If you wish to seek review of this decision when it becomes final, you should immediately review the law applicable to your claims and carefully follow all filing time limits and requirements.  Failure to file within the applicable time limit may result in the dismissal of your case by your chosen forum.

Please read carefully each of the three main possible choices of review below to decide which one applies to your particular case.  If you have questions about whether a particular forum is the appropriate one to review your case, you should contact that forum for more information.

(1) <u>**Judicial review in general**</u>.  As a general rule, an appellant seeking judicial review of a final Board order must file a petition for review with the U.S. Court of Appeals for the Federal Circuit, which must be <u>received</u> by the court

41

within **60 calendar days** of the date this decision becomes final.   5 U.S.C. § 7703(b)(1)(A).

If you submit a petition for review to the U.S. Court of Appeals for the Federal Circuit, you must submit your petition to the court at the following address:

> U.S. Court of Appeals
> for the Federal Circuit
> 717 Madison Place, N.W.
> Washington, D.C. 20439

Additional information about the U.S. Court of Appeals for the Federal Circuit is available at the court's website, www.cafc.uscourts.gov.   Of particular relevance is the court's "Guide for Pro Se Petitioners and Appellants," which is contained within the court's Rules of Practice, and Forms 5, 6, 10, and 11.

If you are interested in securing pro bono representation for an appeal to the U.S. Court of Appeals for the Federal Circuit, you may visit our website at http://www.mspb.gov/probono for information regarding pro bono representation for Merit Systems Protection Board appellants before the Federal Circuit.   The Board neither endorses the services provided by any attorney nor warrants that any attorney will accept representation in a given case.

**(2) Judicial or EEOC review of cases involving a claim of discrimination**.   This option applies to you only if you have claimed that you were affected by an action that is appealable to the Board and that such action was based, in whole or in part, on unlawful discrimination.   If so, you may obtain judicial review of this decision—including a disposition of your discrimination claims—by filing a civil action with an appropriate U.S. district court (*not* the U.S. Court of Appeals for the Federal Circuit), within **30 calendar days** after this decision becomes final under the rules set out in the Notice to Appellant section, above.   5 U.S.C. § 7703(b)(2); *see Perry v. Merit Systems Protection Board*, 582 U.S. ____ , 137 S. Ct. 1975 (2017).   If the action involves a claim of

discrimination based on race, color, religion, sex, national origin, or a disabling condition, you may be entitled to representation by a courtappointed lawyer and to waiver of any requirement of prepayment of fees, costs, or other security. *See* 42 U.S.C. § 2000e-5(f) and 29 U.S.C. § 794a.

Contact information for U.S. district courts can be found at their respective websites, which can be accessed through the link below:

http://www.uscourts.gov/Court_Locator/CourtWebsites.aspx.

Alternatively, you may request review by the Equal Employment Opportunity Commission (EEOC) of your discrimination claims only, excluding all other issues. 5 U.S.C. § 7702(b)(1). You must file any such request with the EEOC's Office of Federal Operations within **30 calendar days** after this decision becomes final as explained above. 5 U.S.C. § 7702(b)(1).

If you submit a request for review to the EEOC by regular U.S. mail, the address of the EEOC is:

Office of Federal Operations
Equal Employment Opportunity Commission
P.O. Box 77960
Washington, D.C.  20013

If you submit a request for review to the EEOC via commercial delivery or by a method requiring a signature, it must be addressed to:

Office of Federal Operations
Equal Employment Opportunity Commission
131 M Street, N.E.
Suite 5SW12G
Washington, D.C.  20507

(3) Judicial review pursuant to the Whistleblower Protection Enhancement Act of 2012. This option applies to you only if you have raised claims of reprisal for whistleblowing disclosures under 5 U.S.C. § 2302(b)(8) or other protected activities listed in 5 U.S.C. § 2302(b)(9)(A)(i), (B), (C), or (D). If so, and your judicial petition for review "raises no challenge to the Board's disposition of allegations of a prohibited personnel practice described in section

43

2302(b) other than practices described in section 2302(b)(8) or 2302(b)(9)(A)(i), (B), (C), or (D)," then you may file a petition for judicial review with the U.S. Court of Appeals for the Federal Circuit or any court of appeals of competent jurisdiction. The court of appeals must <u>receive</u> your petition for review within **60 days** of <u>the date this decision becomes final</u> under the rules set out in the Notice to Appellant section, above. 5 U.S.C. § 7703(b)(1)(B).

If you submit a petition for judicial review to the U.S. Court of Appeals for the Federal Circuit, you must submit your petition to the court at the following address:

U.S. Court of Appeals
for the Federal Circuit
717 Madison Place, N.W.
Washington, D.C. 20439

Additional information about the U.S. Court of Appeals for the Federal Circuit is available at the court's website, www.cafc.uscourts.gov. Of particular relevance is the court's "Guide for Pro Se Petitioners and Appellants," which is contained within the court's Rules of Practice, and Forms 5, 6, 10, and 11.

If you are interested in securing pro bono representation for an appeal to the U.S. Court of Appeals for the Federal Circuit, you may visit our website at http://www.mspb.gov/probono for information regarding pro bono representation for Merit Systems Protection Board appellants before the Federal Circuit. The Board neither endorses the services provided by any attorney nor warrants that any attorney will accept representation in a given case.

Contact information for the courts of appeals can be found at their respective websites, which can be accessed through the link below:

http://www.uscourts.gov/Court_Locator/CourtWebsites.aspx